HUGH ROMANO & others [1] *vs.* DUDLEY A. WEISS & another. [2]

No. 86-297.

Suffolk.   January 8, 1987. — July 1, 1988.

Present: ARMSTRONG, CUTTER, & FINE, JJ.

*Attorney at Law,* Malpractice. *Evidence,* Legal malpractice, Expert opinion. *Negligence,* Attorney at law, Expert opinion.

At the jury-waived trial of malpractice claims by a corporation and its two principal stockholders against an attorney and a law firm alleging that the defendants, in rendering estate planning services, had negligently advised that the corporation's subchapter S election under 26 U.S.C. §§ 1371 et seq. (1970), be terminated, with the result that the Internal Revenue Service assessed a deficiency against the stockholders' joint individual tax return on the basis of the corporation's distribution of certain promissory notes to the stockholders, the judge's finding, on disputed evidence, that the corporation had in fact issued the notes prior to the defendants' having advised the plaintiffs to terminate the subchapter S election, advice which was but one component of a larger estate plan involving considerations other than taxes, the over-all soundness of which the plaintiffs did not question, coupled with the plaintiffs' failure to prove that it was thereafter possible by proper steps to avoid the tax consequences of the issuance of the notes, warranted his entering judgment for the defendants. [169-172]

CIVIL ACTION commenced in the Superior Court Department on November 29, 1978.

The case was heard by *Elbert Tuttle,* J.

*John J. Jennings* for the plaintiffs.

*Erik Lund* for the defendants.

ARMSTRONG, J.   The plaintiffs Hugh and Mary Romano were the principal shareholders [3] of Fidelity Press, Inc., a cor-

---

[1] Mary Romano and Fidelity Press, Inc.

[2] Weiss, Zimmerman, and Angoff, P.C.

[3] There were 1,000 shares outstanding. Hugh owned 573; Mary, 382; their three daughters, 15 apiece.

poration which had been taxed since 1958 as an electing small business, or subchapter S, corporation. See 26 U.S.C. §§ 1371 et seq. (1970).[4] The distinguishing feature of such a corporation is that corporate earnings (or losses) pass through and are taxed (or credited) directly to the shareholders, in proportion to their ownership interests, rather than to the corporation itself. The earnings pass-through occurs whether or not the earnings are actually distributed to the shareholders. Under the statutory scheme in effect in 1975 to 1977 (the years relevant to this action), earnings actually distributed were taxed to the shareholders as dividends, and the balance (earnings not actually distributed) were deemed to have been constructively distributed at the end of the taxable year and were also taxed to the shareholders as a dividend. That balance, however, remained with the corporation, increasing the shareholders' basis in their stock and creating a reservoir of previously taxed income that might be distributed to the shareholders in later years, subject to various conditions respecting time and manner, without further income tax consequence to them. A distribution not made in accordance with these conditions would not be considered as drawn from this reservoir, and thus would, potentially, be subject to further taxation. Such a misfortune befell the Romanos: their treatment of a 1976 distribution of $212,869.66 as drawn on undistributed Fidelity Press income previously taxed to them (in 1975) was rejected by the Internal Revenue Service (I.R.S.). The result was a deficiency assessed against their 1976 joint income tax return of $143,052,[5] plus interest of $16,240.32. The purpose of this action was to recover damages for malpractice from the defendants, Mr. Dudley A. Weiss

[4] References to Federal tax statutes and Treasury regulations are to those in effect in the period 1975-1977, the relevant taxable years for the subchapter S corporation in this case. Section numbers were rewritten and major alterations were effected by the Subchapter S Revision Act of 1982, P.L. 97-354, 96 Stat. 1669. Statements in this opinion are restricted in their application to subchapter S corporations for the years 1975-1977.

[5] Previous payments on the Romanos' 1976 return had amounted to $36,265 ($34,889.93 as originally reported, plus $1,375.07 based on an unrelated earlier adjustment). Their total 1976 tax liability as finally determined by the I.R.S. Appeals Office was $179,317.

and his law firm, who, the Romanos allege, were responsible for bad advice that led to the deficiencies.

Hugh Romano, having at the time a health problem, had approached Weiss in September, 1976, for advice and assistance in preparing an estate plan. (Weiss had done work for the Romanos previously.) Preparing the estate plan necessitated consideration of all Hugh's (and his wife's) assets; thus, attention turned to the status of Fidelity Press, and one of the questions that came up was whether it should retain its "S election" or revoke it. (Weiss testified that the question was raised by Hugh or by Herbert King, who at the time was Fidelity Press's accountant, but Weiss acknowledged that he would have raised the question in any event.) King was asked to prepare certain information, and discussions ensued among Hugh Romano, King, and Weiss. A decision was made to terminate the S election. This was accomplished by a transfer on November 9, 1976, of Hugh's shares to a trust that he controlled, a trust being ineligible under 26 U.S.C. § 1371(a) (subject to an exception not here material, see 26 U.S.C. § 1371[e]) to hold shares in an S corporation. Weiss notified the I.R.S. on November 16, 1976, that the S election had been terminated, and it is agreed that under the then applicable law the termination related back to January 1, 1976. See 26 U.S.C. § 1372(e)(3); Treas. Reg. § 1372-4(c) (1969).

The effect on the Federal income tax liability of Hugh and Mary Romano, as determined by the I.R.S., was as follows: Fidelity Press, operating on a calendar year basis, had shown undistributed earnings for 1975 of $269,182.88. The portion attributable to Hugh and Mary Romano (see note 3, *supra*) and taxed to them as 1975 income was $257,069.66. The corporate records showed a vote of the board of directors on December 27, 1975, to give Hugh and Mary promissory notes for that amount,[6] and the notes, signed by Hugh as president, were dated January 3, 1976. The notes had been omitted by the Romanos from their 1976 return because they treated them

---

[6] The note to Hugh was in the amount of $154,241.80. Mary's was $102,827.86. The three daughters' notes were for $4,037.74 each.

as tax-free distributions of Fidelity Press's 1975 income. After audit, the I.R.S., rejecting the Romanos' treatment of the notes, ruled that the notes should be considered a dividend paid (and taxable) in 1976 (after termination of S status). Here the I.R.S. was applying a general principle that, in order to qualify as a tax-free distribution of an S corporation's current income, the distribution must be made *in money* during the year in which the income was realized or within a two and one-half month window thereafter. See 26 U.S.C. §§ 1373 & 1375; Treas. Reg. §§ 1.1371-1(f) (1968) & 1.1375-5 (1969); *DeTreville* v. *United States*, 445 F.2d 1306, 1308-1311 (4th Cir. 1971). As corporate obligations such as notes do not qualify as money for this purpose, Treas. Reg. § 1.1373-l(d) (1969), *Clark* v. *Commissioner of Internal Rev.*, 58 T.C. 94, 102-103 (1972), the I.R.S. considered the January 3 distribution to be an ordinary dividend paid on the date issued and taxable in accordance with the rules applicable to non-S corporations (found in 26 U.S.C. §§ 301[c] and 316[a]).[7] The I.R.S. did permit the Romanos to offset against the notes $44,200 paid by Fidelity for Hugh's benefit in January, 1976, but the Romanos were not permitted to offset payments made after the two and one-half month window had expired.[8]

It was acknowledged at trial that Weiss or someone else in his law firm had drafted, late in 1976 or possibly in early 1977, both the minutes of the December 27, 1975, meeting of the board of directors and the notes to the Romanos dated January 3, 1976. This was done, the plaintiffs theorized, because Weiss, although aware that the distribution of 1975 corporate earnings to shareholders could be nontaxable if made by March 15, 1976, was unaware that such a distribution, to qualify as nontaxable, would have to be paid in cash. Weiss, in reply, acknowledged that he was not an expert in corporate tax law. He testified, however, that he had not purported to be, that

---

[7] The Romanos' new attorney made a further claim that the notes were not a valid obligation of Fidelity Press and were thus valueless, but this too was rejected by the I.R.S.

[8] Thus the Romanos' 1976 income was ruled to be underreported by $257,069.66 less $44,200, or $212,869.66.

Hugh was aware that Weiss was relying on Hugh's accountant King for evaluation of the tax aspects of the decision to terminate the S election, and, indeed, that he (Weiss) had suggested to Hugh that perhaps backup advice was needed to assist King on the tax aspects,[9] a suggestion Hugh had rejected. Moreover, contended Weiss, the minutes and notes, although drafted in his office, were merely replacements for artlessly drafted minutes and notes that had been prepared and executed earlier, before Hugh came to him in September, 1976.[10] The existence of the earlier notes (which Weiss claimed to have destroyed when he drafted the replacements) was stoutly denied by Hugh, but his denial was compromised by an April, 1976, interim balance sheet of the corporation that showed promissory notes outstanding in an amount that seemed consistent with Weiss's testimony.

An expert for the Romanos, Mr. Joseph F. Ryan, an attorney and a certified public accountant, testified that a reasonably prudent attorney in Weiss's position would have inquired, before terminating Fidelity Press's S status, whether the corporation had made any distributions to shareholders during 1976 or had given any promissory notes.[11] Based on accurate information, he would, first, have delayed any termination of S status into 1977 so as to extend the time for distributing previ-

[9] King was not a certified public accountant. Fidelity's affairs and the Romanos' had long been handled by one Frank Iandoli, a certified public accountant for whom King worked, but Iandoli had died in August, 1976.

[10] Weiss's concern, according to his testimony, had been that Fidelity Press would not be a suitable asset for the Romanos after Hugh's retirement, that a sale of it was desirable in the near future, and that the tax complications of S corporation businesses tended to reduce (in his experience) their marketability. It would also facilitate a sale if minutes, notes, and other corporate records and documents were put in commercially acceptable form.

[11] Weiss had testified that the source of his information as to notes outstanding was Fidelity's December 31, 1975, balance sheet (which showed notes outstanding to Hugh in the total amount of $100,000), that he did not learn of the issuance of the January 3, 1976, notes until he received the August 31, 1976, interim balance sheet in December, 1976, and that he had been told by King, incorrectly, that no distributions had been made to shareholders during 1976. In fact distributions had been made to Hugh (or for him) of $44,200 on January 13; $89,262.20 on April 12; $11,000 (approx.) in June; and $25,000 (approx.) in September.

ously taxed income tax-free.[12] He would then have adjusted the corporate books to record the $44,200 cash payment in January as a tax-free distribution of 1975 income; to record the distributions of $89,262.20 and $11,000 (see note 11, *supra*) as payments against other notes (issued prior to 1975) from Fidelity Press to Hugh amounting to $100,000; to record receipt of a note from Hugh to Fidelity Press in the amount of $25,000 (so as to recast the distribution of that amount in September as a loan from Fidelity Press to Hugh);[13] and to strike the minutes of the December 27, 1975, meeting of the board of directors that authorized the issuance of the notes for the undistributed 1975 income. As to the notes themselves, if they *had* been issued (as Weiss claimed), he (Ryan) would have recalled and destroyed them. (It is not suggested that these revisions would serve any corporate purpose other than alleviating the tax consequences to shareholders of the various 1976 distributions.)

The other witnesses at the trial were the accountant King, who contradicted Weiss's testimony in material respects[14] and

[12] It was agreed by the expert witnesses for both sides that an S corporation could make a tax-free cash distribution of previously taxed income accumulated in prior years after distributing all earnings (in cash) from the current year. That is to say, a cash distribution to shareholders would be treated as a distribution of earnings of the current year to the extent of current earnings and then as a distribution of any undistributed, previously taxed income. See Treas. Reg. § 1.1373-1(d) (1969). Such a distribution could only be made in a taxable year for which the corporation retained its S status. (The termination in November, 1976, related back to January 1, 1976, destroying the ability of the corporation to make a tax-free distribution of undistributed, previously taxed income.) Ryan's plan apparently envisioned a termination of S status in early 1977, accompanied by a distribution at that time of Fidelity Press's 1976 income ($315,505.47) followed by its undistributed, previously taxed income from 1975 and earlier years (approximately $290,000). Ryan acknowledged that the corporation could not have made such cash distributions without borrowing substantially the entire amount, and there is evidence that Romano might not have wished to pay the interest on such a large loan.

[13] Presumably this tactic would be fleshed out by having Hugh give a note to the corporation predated to the day of the distribution.

[14] King testified, for example, that it was Weiss who raised the question of the S election and made the decision to terminate it, that Weiss had told him that he had the August, 1976, interim statement (which if true should

an expert witness for Weiss, one Raymond E. Faulkner, a certified public accountant, who testified that the adjustments in the corporate records advocated by Ryan would not have altered the tax implications of the original transactions (unless, of course, the alterations were concealed from the I.R.S.).[15] He also testified that, in any event, the termination of S status in 1976, as compared to a termination in early 1977 as advocated by Ryan, when collateral tax consequences were taken into account,[16] only increased the total 1976 tax bill for Fidelity Press and the Romanos combined by some $8,284. On cross-examination Faulkner acknowledged that the tax consequences that followed from the notes might have been avoided if, as Hugh and King testified, the notes had not actually been issued prior to Weiss's involvement but had, at most, been authorized by the board.[17]

have alerted Weiss to the fact that distributions to shareholders had been made in 1976), that the notes dated January 3, 1976, were not replacements for earlier, artlessly drawn notes, that no such notes had existed, and that at Weiss's direction he (King) had falsified corporate records to show authorization for and the issuance of such notes early in the year. King, however, was unable satisfactorily to explain why the existence of the notes was reflected as early as April, 1976, in monthly balance sheets prepared by Iandoli, and Weiss, recalled to the stand, emphatically denied King's allegations.

[15] Here we emphasize that nothing in the testimony of Ryan, an attorney and officer of the court, suggested that he was advocating concealment of the changes.

[16] Such as, for example, the lower tax paid by the corporation on 1976 income than would have been paid by the Romanos had that income passed through to them for tax purposes. The maximum corporate tax rate in 1976 was forty-eight percent, whereas the maximum individual tax rate (and the Romanos's own tax bracket) was seventy percent. 26 U.S.C. §§ 1 & 11 (1976). Faulkner's comparison also did not take account of savings to the corporation in interest by using retained earnings for working capital rather than borrowing (as advocated by Ryan), and did not evaluate the collateral estate planning benefits.

[17] Faulkner acknowledged that an erroneous entry in the records, such as one showing issuance of notes where notes had not been issued, could properly be corrected by a subsequent adjusting entry. For cases in which taxpayers have been relieved of the tax liability created by bookkeeping errors, see *Reinschmidt* v. *Commissioner of Internal Rev.*, 28 F.2d 660, 661 (5th Cir. 1928); *Dial* v. *Commissioner of Internal Rev.*, 24 T.C. 117, 126 (1955), acq., 1955-2 C.B. 5.

On this critical point, however, the judge accepted Weiss's testimony and rejected that of King and Hugh. He found that the notes had been issued in the early months of 1976, sometime prior to April 30, when they showed up on the monthly balance sheet prepared by Iandoli, and that Weiss's role was only to redraft them in more commercially acceptable form. The Romanos do not (and could not successfully) contend that this finding is unsupported by the evidence. The finding that they do attack as against the weight of the evidence and clearly erroneous is a finding that Weiss did not hold himself out to be competent to render legal advice in the area of corporate taxation. The latter finding, however, is of tangential relevance unless it was possible, in late 1976 or early 1977, to reverse the tax consequences of the issuance of the notes.

The expert witnesses, Ryan and Faulkner, were in disagreement on the last point. Ryan, it will be recalled, offered as his opinion that a reasonably careful attorney, learning (as he thought Weiss should have) in September or October, 1976, of the issuance of the notes earlier that year, would have recommended that the notes be cancelled and the corporate entries reflecting their issuance be reversed, so that the 1975 corporate profit, which they represented, could be redistributed in cash form prior to terminating the S election. The judge's decision indicates acceptance of that testimony (at least arguendo — the point was not central to the judge's analysis), stating that "[t]he tax deficiency assessment on Hugh and Mary Romano could have been avoided with proper tax planning. If the two notes payable to the Romanos [ ] were cancelled and the accounting entries reversed prior to the change in the subchapter S tax status of Fidelity Press, Inc., the deficiency could have been avoided."

Doubtless as a general rule, where a proposition is the subject of conflicting expert opinions, the trial judge as finder of fact is entitled to adopt one opinion and reject the other, see *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 634, 639 (1985), and his selection will not be reviewable on appeal except under the clearly erroneous standard of Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). Where the point

in dispute between the experts is a question of law, however, common sense dictates that the usual rule must be subject to a qualification: that, at least in instances where the point in dispute is one of settled law,[18] the finder of fact should be instructed (or should instruct himself) what the law applicable to the subject is, and should not be permitted to return a finding or verdict premised on an erroneous view of the law. In this situation the judge's instruction on the point of law or his ruling, express or implied, should be subject to appellate review in the same manner as any other instruction or ruling.

The point of law in dispute here falls in that category. The notes found to have been issued by Fidelity Press to Hugh and Mary Romano in early 1976 were, as matter of law, dividends taxable as income to them when issued, regardless whether they were or were not cancelled later in the year, or in early 1977, solely to avoid the unfavorable tax consequences. "[I]t is not given to a taxpayer to lift the federal tax hand from income, which he has once received in absolute right, by an attempt thereafter to alter its legal status through modification of the agreement out of which it arose." *Leicht* v. *Commissioner of Internal Rev.*, 137 F.2d 433, 435 (8th Cir. 1943). (In that case the taxpayer had agreed to a retroactive reduction in salary, instead crediting payments he had received from the corporation as salary to the reduction of the corporation's promissory note to him.) Compare *Soreng* v. *Commissioner of Internal Rev.*, 158 F.2d 340 (7th Cir. 1946) (taxpayers received dividend from corporation but, pursuant to preexisting contract with lending institution, repaid the dividend immediately to the cor-

---

[18] A sound argument can be made that even if the point is the subject of uncertainty, it should, if a pure question of law, be resolved by the court, not by the finder of fact, and be subject to appellate review like any other ruling. See *Martin* v. *Hall,* 20 Cal. App. 3d 414 (1971) (where alleged malpractice concerned failure to raise legal defenses in criminal trial, judge should instruct jury as to how the court would have ruled on the defenses); *Stafford* v. *Garrett,* 46 Or. App. 781 (1980) (whether malpractice plaintiff would have prevailed on appeal on underlying case is a question of law to be decided by the court). See generally Mallen & Levit, Legal Malpractice § 659 (2d ed. 1981). The present case does not require resolution of that question.

poration); *Crellin's Estate* v. *Commissioner of Internal Rev.*, 203 F.2d 812 (9th Cir.), cert. denied, 346 U.S. 873 (1953) (corporation and its shareholders, upon learning that a dividend declared and paid out had disadvantageous tax consequences, agreed to and effected a recall thereof); *Blanco* v. *United States*, 602 F.2d 324, 327-328 (Ct. Cl. 1979), cert. denied, 444 U.S. 1072 (1980) (corporation redeemed shares of principal shareholder for property valued at $65,200; before end of year, to avoid treatment of $65,200 as a dividend taxable to shareholder, corporation returned shares to shareholder and accepted instead his note for $65,200). "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequence of his choice, whether contemplated or not . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Commissioner of Internal Rev.* v. *National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974). See generally 10 Mertens, Law of Federal Income Taxation § 38B.10 (1985).

Thus, the finding that the notes had in fact been issued in January, 1976, coupled with a failure of proof that it was thereafter possible by proper steps to avoid the tax consequences of their issuance, vitiated the thrust of the Romanos' attempt to show that they were damaged by the termination of Fidelity Press's S election in 1976. We recognize that, according to the testimony of Weiss's expert, Faulkner, the termination resulted in a combined 1976 tax obligation for the Romanos and Fidelity Press that was slightly larger ($8,284) than that which would have resulted from Fidelity Press's retaining S status. It was, of course, not possible in the autumn of 1976 to know with certainty whether termination at that time would cost or save taxes in 1976, because Fidelity Press's earnings could not be known with certainty for several more months. Approximation, if possible, would presumably have shown that the tax effect would be sufficiently close to breakeven as not to be decisive in the timing. Here it must be emphasized, as the judge did in his thoughtful opinion, that the termination decision was but one component of a larger estate plan, the over-all soundness of which has not been brought into question,

see *Colucci* v. *Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. 107, 111-112 (1987), and that prompt termination of the S election may have involved considerations other than the tax effect for 1976. Indeed, we do not understand the Romanos to be contending that the decision to terminate in 1976 was questionable except as it bore on the tax liability generated by the note distribution. It follows that judgment was correctly entered for the defendants.

*Judgment affirmed.*