Coven, J.
This is a Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal by the plaintiff of the entry of summary judgment against her on claims against the sellers, brokers and a well testing company arising out of her purchase of a home with inadequate well water.
On March 23, 1994, plaintiff Karen Coughlin purchased a house located on a nine acre tract of land within the Nashoba Water District in Townsend, Massachusetts. Within only seven days of the purchase, the well which supplied the home’s water ran dry. The plaintiff filed this action on March 21, 1997. Her complaint alleged misrepresentations by the sellers, Frank LoFrisco and Beverly Iachetta (the “Sellers”); misrepresentations and G.L.c. 93A unfair and deceptive practices by the brokers, Roger Gascombe and Gregory Plummer (the “Brokers”), and misrepresentation and negligent performance of a well inspection by Welltech Corp. (“Welltech”). The Brokers filed cross-claims against the Sellers and Welltech, and file Sellers filed cross-claims against the Brokers and Welltech. All claims failed. Summary judgment was entered in favor of each defendant on the plaintiffs complaint. Summary judgment was allowed in favor of the Brokers and Welltech on the Seller’s cross-claims. Summary judgment was also entered against the Brokers on their claims for indemnification by the Sellers and for contribution by Welltech. The plaintiff now appeals the court’s entry of judgment in favor of ail defendants on her complaint. The Brokers have also appealed the allowance of summary judgment against them on their indemnification cross-claim against the Sellers.
Viewing the summary judgment materials in the light most favorable to the plaintiff, O’Sullivan v. Shaw, 431 Mass. 201, 203 (2000), the following is apparent. The house in question was constructed in early 1993. The well which supplied the water to the house had a low production reading from the time if was drilled, was hydrofracked several times and finally produced a water level of 1.5 gallons per minute (“gpm”) in the early spring, the very minimum level required for an occupancy permit. The Sellers purchased the house on June 23, 1993, experienced water problems almost immediately, and placed the property on the market in early September, less than three months after they had moved in. They listed the *322 property with Century 21, Pepperell Associates (“Century 21”), with which the Brokers are associated. In connection with the listing, the Sellers completed a property description form (“Sellers’ Description”) on September 14, 1993. The standard form requested information from the Sellers to be provided to prospective purchasers. The Sellers answered “No” to question 31 which asked if there were any drinking water problems. The Sellers also answered “No” to question 58 which asked if they had any information about their land or house which would either affect the decision of a buyer to purchase the realty or affect its use by a buyer. The Sellers’ Description form contained the Sellers’ agreement to defend and indemnify the Brokers for their disclosure of the information the Sellers had represented as accurate.
Donald Crump (“Crump”), a prospective purchaser, viewed the property in the early autumn of 1993. He asserts by way of affidavit that when he turned on a few plumbing fixtures to measure the water supply, the upstairs shower “diminished to a trickle.” Seller Beverly Iachetta was present during this exercise, and quickly demonstrated her familiarity with the well’s problems by dashing downstairs to activate override switches in an attempt to get some water pumping. This episode proved enough for Crump, who informed the Sellers and a Century 21 representative that he would not purchase the property because of the water supply problem. In an effort to preserve a deal with Crump, the Sellers brought in a drilling company to dig a second well. Even after the company drilled down to 1400 feet, the second well did not produce.
Although the Sellers had obtained a 1.5 gpm reading of the original well’s output from Cummings Drilling Co. only a few weeks earlier, they had Skillings & Sons (“Skillings”) test the production rate again on September 24,1993. A reading of .5 gpm, or only one-third of the minimum water level required for house occupancy, was obtained. The Skillings report of September 28, 1993 clearly informed the Sellers that the well had an “inadequate water supply.” The Sellers offered Crump a reduction in the purchase price. Crump, by then aware of both the Skill-ings report on the original well and the failure of the second well attempt, declined to entertain any thought of purchasing the property. Crump averred that he advised someone from the Brokers’ firm that they had to inform any future prospective buyer of the water problems he had encountered, and was assured that the problems would be disclosed to potential purchasers.
The Sellers relisted the property with the same brokers and, in January, 1994, gave them a copy of the Skillings report. The plaintiff viewed the property at an open house in January. At one point during her dealings with the Brokers, she was shown a piece of paper with a Skillings heading which she “couldn’t malee out.” When, at a later time, she requested a copy of the actual Skillings report from Broker Gregory Plummer, she was told that she had everything. The plaintiff has averred that despite her requests, she was never given a copy of the Skillings report, nor informed of its actual contents, until after her purchase of the property.
The plaintiff executed an offer to purchase the property on February 1, 1994. She exercised her right, as provided in the offer, to have the well inspected. On February 14,1994, Welltech conducted a well production rate test which consisted of turning the water on and letting it run until the well ran dry. This process took less time than the scheduled four hours. The Welltech technician, unaware of the Skillings report, informed the plaintiff that the test indicated a flow rate of 1.5 gpm. He stated that this rate was below the 5 gpm rate required if an FHA loan is sought.
Concerned about whether the water levels would satisfy her family and household needs, the plaintiff asked the Welltech technician what the test results actually meant. He responded that the 1.5 gpm rate was liveable, but not the optimal reading. While the technician cautioned that the plaintiff could not water the lawn *323 and wash three or four cars at the same time as she could with city water, he added that he lived in a home with a well production level equal to the 1.5 gpm test rate and that he and his family functioned without a problem. It is undisputed that the technician then concluded that the “most important” way to resolve the plaintiffs questions and concerns was to ask the Sellers how they had lived with the water levels. Plaintiff turned to the Broker at the scene and pointedly asked this “most important” question. The plaintiff asserts that the Broker replied that the Sellers didn’t have any problem. The plaintiff accepted and relied upon this representation, and made no further inquiries of the Sellers.
On February 15,1994, the day after the Welltech test, the plaintiff and the Sellers executed a purchase and sale agreement. The agreement contained a “Warranties and Representations” clause, paragraph 25,[2] which provided that the buyer had not relied upon previous representations by the Sellers and Brokers which were not included in the agreement.
1. Plaintiffs cause of action for misrepresentation against the Sellers and the Brokers rests upon statements antecedent to the execution of the purchase and sale agreement and not made a part thereof. These include the Brokers’ misrepresentation[3] that the Sellers did not have any problems with the well production rate. The Sellers and Brokers contend that they are entitled to summary judgment as a matter of law because the alleged misrepresentations were rendered inactionable by paragraph 25 of the purchase and sale agreement. However, where fraud and deceit are involved, general contractual disclaimers and exculpatory clauses have not automatically prevented a plaintiff from litigating his reasonable reliance on the misrepresentations in question. See Ajalat v. Cohen, 1998 Mass. App. Div. 266, 268, citing Sheehy v. Lipton Indus., Inc., 24 Mass. App. Ct. 188, 193-194 (1987). See also Vmark Software, Inc. v.EMC Corp., 37 Mass. App. Ct. 610, 619 n.11 (1994); Carleton v. Timpone, 2000 Mass. App. Div. 83, 85.
As a matter of principle it is necessary to weigh the advantages of certainty in contractual relations against the harm and injustice that result from fraud. In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it. ... The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of *324 contractual devices.... To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.
Bates v. Southgate, 308 Mass. 170, 182 (1941).[4]
The Sellers and Brokers mistakenly rely on Greenery Rehabilitation Group, Inc. v. Antaramian, 36 Mass. App. Ct. 73 (1994) for the contrary proposition. That case is inapposite. The Greenery Court held that the ‘Warranties and Representations” and “Acceptance of Deed” clauses in the parties’ agreement therein barred the plaintiffs misrepresentation claim because the clauses in question were not “boilerplate,” but were instead specific compromises achieved after lengthy negotiations between the parties on the particular issue of the survival of antecedent representations. There is no evidence in the instant case that paragraph 25 or any other exculpatory provision of the standard form purchase and sale agreement was ever discussed, much less negotiated and compromised, by the parties. The first sentence of paragraph 25 is pure boilerplate. Further, in the absence of contrary evidence, it must be inferred in the plaintiffs favor that the second typewritten sentence was unilaterally added by the Brokers for their own benefit.
2. The remaining argument of the Sellers and Brokers in support of the summary judgment in their favor is that the plaintiff would be unable to establish at trial that she reasonably relied upon their alleged misrepresentations or omissions. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). They emphasize that the plaintiff had her own well production test performed which indicated that the flow rate was less than the 5 gpm standard prescribed by the FHA. The latter point is irrelevant. The plaintiff was not seeking FHA financing. Nor did the Nashoba Water District or the local Board of Health require a flow rate of 5 gpm as a condition of home occupancy. As Welltech concedes in its brief, the technician in fact explained to the plaintiff that the 5 gpm rate was simply an optimum reading which would permit a homeowner to use water without limitation or “if you want to live like you have water coming in from a water line.” The technician went on to clarify that a family could live with a 1.5 gpm level.
Moreover, the fact that the plaintiff had her own well test performed misses the mark on the question of reliance. After the Welltech test was completed and the technician had attempted to explain its results, the plaintiff still turned to the Broker for his response to what the technician had identified as the dispositive question. The plaintiff asserts that her decision to purchase the property was made in reliance on the Broker’s answer that the Sellers had not experienced any problems. Reasonable reliance is ordinarily a question of fact, see Cataldo Ambulance Serv., Inc. v. Chelsea, 426 Mass. 382, 387 (1998), inappropriate for resolution on summary judgment. It remained so in this case.
3. While reliance is an essential element of the tort of deceit, Nei v. Burley, 388 Mass. 307, 311 (1983); RESTATEMENT (SECOND) OF TORTS §537 (1977), a plaintiff is not required to prove reliance to recover for a G.L.c. 93A unfair and *325 deceptive act. Zayre Corp. v. Computer Sys. of America, Inc., 24 Mass. App. Ct. 559, 570 (1987); Gilmore v. Dynamic U.S.A., Inc., 1992 Mass. App. Div. 100, 102. Liability under G.L.c. 93A arises when a “person ... fails to disclose to a buyer or prospective buyer any facts the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.” 940 CMR §3.16(2). See generally Schwartz v. Rose, 418 Mass. 41, 45 (1994); Sargent v. Koulisas, 29 Mass. App. Ct. 956, 958 (1990). Proof of such nondisclosure and its causal relationship to the plaintiffs injuries, see Heller Financial v. Insurance Co. of No. America, 410 Mass. 400, 409 (1991); PDM Mechanical Contractors, Inc. v. Suffolk Constr. Co., 35 Mass. App. Ct. 228, 237 (1993), is sufficient to warrant a statutory recovery.
The Brokers herein represented to the plaintiff that the Sellers had no problems with the well production. The Brokers knew otherwise. Not only was Century 21 familiar with the Crump scenario, but the Brokers also had the Skillings report. The plaintiff asserts that her acceptance of the Welltech report and her decision to purchase the property would have been influenced by the contents of the Skillings report had they been made known to her. According the plaintiff the benefit of all favorable inferences for summary judgment purposes, Zhang v. Massachusetts Inst. of Tech., 46 Mass. App. Ct. 597, 598 (1999), it is clear that sufficient facts have been set forth to warrant a trial of the plaintiffs G.L.c. 93A claim against the Brokers.
4. The record also presents a clear dispute of material fact precluding summary judgment on the plaintiffs claim against Welltech for negligent performance of the well test. In support of her claim, the plaintiff submitted the affidavit of an expert who opined that the 1.5 gpm reading obtained by Welltech could not have been “accurately determined from the methodology employed.” The expert indicated that Welltech failed to measure the water level drawdown or recovery rates during the test. Welltech argues that the affidavit of its owner established instead that the more expensive test recommended by the plaintiffs expert is utilized only for municipal or commercial wells, that the industry standard for residential well testing is the water quantity test performed by Welltech, and that correct results were obtained.
A dispute between experts, however, on a material issue of fact ordinarily presents a matter to be resolved by a trier of fact. Romano v. Weiss, 26 Mass. App. Ct. 162, 169 (1988). Summary judgment does not permit a “trial by affidavit,” expert or otherwise. Feliz v. 128 Imports, Inc., 31 Mass. App. Ct. 965, 968 (1992). It must instead be inferred in the plaintiffs favor, on this summary judgment review, that additional testing may have been required and that Welltech’s reading of 1.5 gpm may have been incorrect. Additional evidence in the record in fact supports the plaintiffs assertion that the actual well production rate was less than the Welltech 1.5 gpm test result,[5] and thus less than the minimum level required for house occupancy. Such evidence includes the Skillings report of a .5 gpm level and the plaintiffs description of the lack of water after she and her family moved in only five weeks after the Welltech test. In short, the plaintiff has advanced sufficient evidence to permit a trial on her claim that Welltech was negligent in failing to determine, prior to the plaintiffs purchase, that the house was not fit for occupancy due to inadequate water levels.
5. Conversely, the trial court properly entered summary judgment on the plaintiffs claim against Welltech for negligent misrepresentation. “A claim for negligent misrepresentation is ordinarily one for a jury, unless the undisputed facts are so clear as to permit only one conclusion.” Nota Constr. Corp. v. Keyes Assoc., Inc., 45 Mass. App. Ct. 15, 20 (1998). Essential to any recovery for that tort is evidence of reliance by the *326 plaintiff upon the incorrect information provided by the adverse party. Nycal Corp. v. KPMG Peat Marwick LLP., 426 Mass. 491, 495-496 (1998); Golber v. BayBank Valley Tr. Co., 46 Mass. App. Ct. 256, 257 (1999). The plaintiff has failed to marshal any facts to sustain her burden of proof at trial on the element of reliance. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Indeed, the plaintiff’s deposition testimony makes clear that she did not rely, in purchasing the property, upon the Welltech technician’s statements about how his family managed on a similar well production rate or upon his recommendations about which activities were inadvisable with low water levels. The plaintiff testified that she relied instead upon the Broker’s answer to the “most important” question suggested by the technician; namely, that the sellers had no problems with the well production rate.
6. The Brokers’ cross-claim for indemnification by the Sellers[6] is based exclusively on the indemnification provision of the Sellers’ Description of property form. The Sellers’ duty to indemnify under that provision would arise only if the plaintiffs misrepresentation claims against the Brokers were based on the information provided by the Sellers in the property description form. This was not the case. The plaintiffs claims against the Sellers and Brokers are based in large part on their failure to disclose the contents of the Skillings report when requested to do so by the plaintiff. The Skillings report was issued on September 28,1993, fourteen days after the Sellers signed the disclosure form.[7] Thus the circumstances which gave rise to the plaintiffs claims occurred after, and outside of the context of, any statements made in the Sellers’ Description. Absent any relationship between the Sellers’ statements and the misrepresentations upon which the plaintiffs claims against the Brokers are founded, the Brokers have no right to indemnification by the Sellers in this case. Summary judgment was properly entered on the Brokers’ cross-claim against the Sellers.
Accordingly, the summary judgment entered for the Sellers and Brokers on the plaintiffs complaint is reversed. Summary judgment in favor of Welltech on that portion of the plaintiffs claim seeking relief for negligent testing is also reversed. The court’s judgment for the Sellers on the Brokers’ indemnification cross-claim is affirmed. This action is returned to the Ayer Division for trial.
So ordered.

 Paragraph 25 stated: “The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker (s).” The following typewritten language appears after the first sentence: “None. It is understood and agreed by all parties hereto that Century 21 Pepperell Associates, Inc. and their agents do not warrant or guarantee the property which is the subject of this agreement.”

 In addressing the liability of the Sellers as well as the Brokers, we follow the general rule that a principal is liable for the misrepresentations of an agent acting within the scope of the agent’s employment. See Kansallis Finance Ltd. v. Fern, 421 Mass. 659, 669 (1996); Fennell v. Wyzik, 12 Mass. App. Ct. 909, 910 (1981); Tucker v. Badoian, 5 Mass. App. Ct. 904, 905 (1977). As to the Sellers’ own misrepresentations, the record does not indicate whether the Sellers’ Description of property was ever shown to the plaintiff. The Sellers’ liability for the misstatements made in the property Description or for any other misrepresentations is a matter for trial.

 The public policy considerations upon which Bates was decided were just revisited by the Appeals Court in Sound Techniques, Inc. v. Hoffman, 50 Mass. App. Ct. 425 (2000). The Court reiterated in that case that the “established” public “policy of this Commonwealth [is] to refuse to enforce a merger clause for purposes of protecting a party from liability on account of his fraud and deceit.” Id. at 430. The Court held, however, that this public policy does not extend to a cause of action based upon negligent misrepresentation. Rather, the “general policy of upholding freedom to contract” prevents a plaintiffs avoidance of a contractual disclaimer that has been “agreed to, uninfluenced by any fraud or other egregious or intentional misbehavior....” Id. at 434. In this case, we are confronted with plaintiff’s claims for fraud and deceit. Sound Techniques, Inc. is thus inapplicable.

 ‘The line between a proper inference and unwarranted conjecture is not easily drawn. The answer depends on the evidence in the case and what the trier of fact may reasonably infer from that evidence.” Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 664 (1981).

The issue of the Sellers’ duty to defend is deemed waived as it was not argued on this appeal, Dist./Mun. Cts. R. A. D. A., Rule 16(a) (4); GE Products Corp. v. Stewart, 414 Mass. 721, 722 n.1 (1993), nor apparently raised before the motion judge. Palmer v. Murphy, 42 Mass. App. Ct. 334, 338 (1997). In any event, it is irrelevant given our disposition of the Brokers’ cross-claim.

 If there is any argument that the Sellers had a continuing duty to disclose material facts, such as the Skillings adverse well production test, the knowledge of the Brokers of that exact information would preclude their recovery for indemnification. While, as the Brokers point out, it is a general principle that “[a]n agent who makes untrue statements based upon the information given to him by the principal is not liable because of the fact that the principal knew the information to be untrue,” RESTATEMENT (SECOND) OF AGENCY, §348, comment b (1958), the non-liability of the agent is dependent upon his reliance upon the untruthful statement made to him by the principal. At the time the plaintiff herein asked questions about the well, the Brokers knew that the statements made by the Sellers in the property disclosure were untrue. There could not, therefore, have been any reliance by the Brokers upon the disclosure statements.